UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:11CR-00095-001-RLM |
| | ) | |
| THOMAS F. LEWIS III. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR
<u>VARIANCE FROM SENTENCING GUIDELINES</u>**

**Introduction**

There are cases in the criminal justice system that on their face do not fit well into the sentencing guidelines or the jurisprudence interpreting them.  They provide unsettling incongruities that do not fit into cookie cutter explanations or motivations that are typically and frequently attributed to criminal conduct.  And they illuminate the challenges of the sentencing guidelines grid and its inability, at times, to understand the pertinent conduct, get a sense of the person who engaged in the conduct, or arrive at a sentence that reasonably and satisfactorily addresses the many, and sometimes competing, policy considerations imbued in our sentencing jurisprudence.  This is just such a case.  As such, and for the reasons provided in this pleading, the Defendant asks the court first to determine the applicable guideline range significantly below that which has been calculated by the United States Probation Office, and thereafter to apply the 18 U.S.C. 3553(a) factors to issue a sentence that varies downward from the guideline range.

The bases for this request are as follows:  1) Though the Defendant consciously avoided learning the truth about the scheme, nevertheless, the scheme was not his, thereby making U.S.S.G. §2B1.1(b)(9)(C) inapplicable to him; 2) The Defendant was a

1

minimal participant in the scheme, pursuant to U.S.S.G. §3B1.2(a); 3) The Defendant should not be given a two level increase pursuant to U.S.S.G. §2(B)1.1(b)(8)(B) because Barney Canada, the mastermind of the scheme was not given this increase; 4) The Defendant's extraordinary and lifetime commitment to community service and charitable works merits consideration for a decrease in his sentencing guideline calculation, pursuant to U.S.S.G. §5H1.11; and 5) The Defendant's role and place in his family merits consideration for an additional decrease pursuant U.S.S.G. § 5H1.6.

### Historical Background

The court needs no introduction to Barney Canada or his scheme.  Canada is a four time convicted fraudster and pathological liar who, for virtually all of his life, has preyed upon trusting people.  This time, adorned in the garb of a Catholic priest, Canada was the equivalent of what the Psalmist describes as a "prowling criminal."  (Ps 68, v 21, NAV).  In Chip Lewis, Canada found a man whose heart is, and always has been, given in service to Christ; a man who readily and unquestionably accepted, defended, and was inspired by his story of atonement and conversion, even in the face of glaring red flags.

Canada found a man who, by Lewis's own admission, shut his eyes and ears to all of the mounting evidence of Canada's true nature, allowing that evidence to become mere background noise in his defense of the scam artist.  He found a man in Lewis who, on a psychological level, became so invested in his representation of Canada, that his own sense of virtue became somehow tied up in ensuring or convincing himself of Canada's goodness.  He found a naïve man who had never committed any offense or been in any trouble in school or otherwise, had never represented a criminal defendant, and had never been exposed to the criminal justice system or those who, like Canada, have spent their

2

lives manipulating its waters.  And Canada found a man who, again by Lewis's own admission, was governed in his professional life by arrogance.

 Canada needed a small cog in his vast fraudulent machine, an attorney who would look at loan documents and communications brought to him by Canada, and would be willing to send threats of counter-suit to those borrowers who were demanding advance fee refunds.  In Chip Lewis, Canada got much more than that, and in a manner befitting Canada's shrewd and calculating nature, he used Lewis to the greatest extent possible to add an additional aura of legitimacy to his scheme.  Psychopaths have an inherent sense of another's total loyalty and trust, and at the outset Canada was able to sense, and then fully manipulate, Lewis and his loyalty.

Having worked this particular advance fee fraud scheme before, Canada was a seasoned veteran by the time he met Lewis.  He knew that time was on his side with regard to any disgruntled potential borrowers, and that attorneys are very good at prolonging conflicts, or making their resolution more expensive.  Canada knew that his victims, desperate borrowers who had many times been turned down in the conventional lending markets, were not well positioned financially to pay the costs of litigation to get their advance fees refunded.  He needed an attorney who would look at a loan document, listen to his explanation for why the loan had not succeeded, then respond to the disgruntled borrower's threat of a suit with "if you sue my client, he'll counter."

Because of Chip Lewis's personality, Canada got considerably more than he probably hoped for.  Lewis became Canada's biggest advocate.  When Canada told him borrowers were shady people, Lewis believed him, and fashioned his interactions with them accordingly.  When Canada introduced Lewis to his religious superior, Lewis wrote

a letter of recommendation on Canada's behalf, in support of some form of ecclesial promotion in Canada's church.  And in the height of the storm, from 2007 through 2009 when the real estate markets were crashing virtually everywhere and Canada's "business" was concomitantly flourishing as a result, Lewis wrote a letter of reference for Canada to a Chicago real estate firm with whom Canada was seeking a relationship.

In return for all of this, Lewis, a strong and committed family man in financially difficult circumstances,[1] received only his hourly fee for his work.  A good portion of that fee, almost forty-eight (48%) was then applied to his law firm's overhead.[2]  While Canada was bilking people out of approximately $3.5 million, Lewis was netting approximately fifty-two cents on the dollar of his normal hourly fee.[3]

## I.  Legal Standards

As a result of the Supreme Court's decision in *U.S. v. Booker,* 543 U.S. 220 (2005), the Federal Sentencing Guidelines have become advisory in nature.  After *Booker,* sentencing courts "must still consider the guideline range, 18 U.S.C. § 3553(a)(4) & (5), but must also consider the other directives set forth in § 3553(a).  Thus, under *Booker,* courts must treat the guidelines as just one of a number of sentencing factors."  *U.S. v. Ranum,* 353 F. Supp. 2d 984, 985 (E.D. Wis. 2005).  Because the

---

[1] In 2004, the Lewis's declared personal bankruptcy, and from 2005 forward, they have been on a monthly payment plan with the I.R.S. to repay a six figure tax obligation.

[2] Lewis derived some benefit from this ability to pay his firm overhead, as it assisted him in maintaining his business practice at his firm.  But it is incorrect to argue, as the government does, that this benefit, and Lewis's I.R.S. debt, provided the motive for him to enter into Canada's scheme.

[3] By way of comparison, a Boston attorney representing one of the borrowers billed at three times Lewis's hourly rate. During the seven year span, Lewis's billables attributed to Canada averaged approximately 20% of his total billables.  In 2008 and 2009, Canada represented approximately 48% of those billables, and from 2002 through 2007, he represented approximately 15% of Lewis's billables. These figures are taken from a prior defense counsel worksheet and are believed to be accurate.  However, they are approximations, and the Defendant, and his undersigned counsel, will defer to the government's numbers on this point, as the government is in possession of all the historical billing records.

guidelines are advisory, the District Court is not required to impose a sentence within the range determined by the Court.  *U.S. v. Laufle,* 433 F.3d 981, 984-85 (7th Cir. 2006).

Sentencing courts are "free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the § 3553(a) factors." *Ranum,* 353 F. Supp. 2d at 987.  After computing the applicable guideline sentencing range, a judge has discretion to impose a reasonable sentence that is outside the range. What makes a sentence reasonable, however, depends on the specifics of the case at hand, and 18 U.S.C. § 3553(a) lists the factors that control after *Booker.*  See, *U.S. v. Dean,* 414 F.3d 725, 729 (7th Cir. 2005).

## I.  Relevant Conduct and Acceptance of Responsibility

In his plea agreement, Lewis has admitted to knowingly aiding and abetting Canada's scheme by improperly vouching for Canada, and by consciously avoiding numerous red flags that, had he acted upon them, might have limited or possibly ended Canada's scheme.  He has also admitted representing to approximately a half dozen borrowers or their legal counsel that Canada had closed loan deals before, when he knew this was not true. While Lewis does not remember his misrepresentations of specific loans having closed, he cannot deny the truthfulness of the attorneys and some borrowers who have provided sworn statements, and in one instance contemporaneous notes of discussions, of specific deals they were told by Lewis had closed.[4]

---

[4]Lewis has also admitted to knowing that Canada never closed <u>any</u> deals, though this admission can mistakenly be given more weight than it should.  Lewis knew Canada was working in the hard to place commercial real estate lending world and he knew that he had never closed any loans with Canada.  But at some point he also knew that Kennedy Funding had made a loan offer to one of Canada's clients.  So, Lewis's knowledge that Canada had never closed any loans was indeed a red flag, particularly with the

In addition, Lewis has admitted that in the *Simplon Ballpark LLC* bankruptcy proceeding, he assisted Canada in drafting at least one declaration that he knew or should have known contained an untrue statement.  Specifically, Canada, through Simplon's bankruptcy counsel Thomas Nelson, had declared to the court that he was a direct lender with sufficient loan funds available to pull the matter out of bankruptcy.  Lewis was not involved in that declaration.[5]  As was the case with all of the Canada deals on which Lewis did any legal work, Canada had already struck the deal and obtained the advance fees long before Lewis was even aware such a deal existed.  In fact, Lewis was only used by Canada in approximately one-third of Canada's transactions and was only substantively involved in just over a dozen of those.  He never played any role in securing new clients, in determining what advance fees to charge, or in collecting those fees.  By the time Lewis got involved in any particular transaction, the fix, so to speak, was already in, as Canada already had the advance fee money in his pocket.

However, Lewis was involved in drafting subsequent declarations in the *Simplon* case that continued to mislead the court into believing that Canada was moving the matter to a loan closing.  Moreover, Lewis assisted Canada in drawing up a declaration that both denied and misrepresented Canada's prior criminal history with regard to an advance fee scheme for which Canada served time in the early 1990's.  The scheme in question utilized the same *modus operandi* as Canada was using in his advance fee mortgage

---

passing of time and the accumulation of additional failed transactions, but it was not, standing alone, its own proof to Lewis of Canada's scheme.

[5] Canada was not given a two level enhancement for misrepresentation to the bankruptcy court as a result of his first declaration (wherein he told the court he was a direct lender), which Lewis did not work on, or any of his subsequent declarations (wherein he misled the court into believing he was moving the loan towards closing), which Lewis did work on.

lending scheme, and was the subject of a published opinion by the First Circuit Court of Appeals, which opinion was both cited and quoted in the creditors' pleading.

Of all the red flags being waved in front of him, Lewis admits this one should have been the largest and brightest. At their initial meeting in 2002, Canada had told Lewis about a single conviction in the early 1990s for being caught up in a Michael Milliken type of bond scheme in which he purported to being somewhat of a fall guy for the bigger players. However, this particular Canada declaration in *Simplon* was in response to a filing by the bankruptcy creditors, wherein the First Circuit's opinion was quoted on the first page of the filing, and referenced the early 1990's Canada conviction for an advance fee fraud scheme that was entirely unlike the Milliken-type junk bond scheme Canada had confessed to Lewis. Instead, the cited Canada conviction was quite similar to what several borrowers, their counsel and the press were indicating to Lewis was Canada's current *modus operandi.*

A lone attorney's or a single defrauded borrower's recollection of a conversation might, standing alone, be subject to scrutiny. However, the sworn statements of several attorneys (one with contemporaneous notes) and borrowers, when coupled with Paragraph 2 of the September 2, 2008 *Simplon* declaration referenced above, cannot reasonably be refuted, and they are the reasons Mr. Lewis stands before this court for sentencing. He admits to them and accepts responsibility for them.[6]

---

[6] The government has incorrectly argued that Lewis counseled Canada not to disclose the name of the hard money lender to the bankruptcy court, and it relies on this particular September 2, 2008 Declaration, and presumably Canada's own self-serving statements, for proof of that. In this Declaration, which Lewis assisted Canada in drafting, Providence Funding disclosed to the court for the first time that it "is a correspondent underwriter for a recognized hard money lender that has funded over one billion dollars in hard to place commercial real estate transactions in the past twenty years." It was in response to this Declaration that the court, on September 2, 2008, ordered Canada, through Simplon's attorney Nelson, to produce by September 5th the name of the lender and a list of loans that Canada had closed. In response to that, Canada told Lewis he did not want to risk losing the 4% commission on the $35 million loan if

## II.  Sentencing Guidelines Analysis

Since the *Booker* case, the determination of the appropriate sentencing guideline level, while still important, has taken on less significance in terms of the ultimate sentencing decision. See, for example, *U.S. v. Duhon,* 541 F.3d 391 (5th Cir. 2008), (where the appellate court upheld the district court's five year probationary sentence in a child pornography case, noting that the exact calculation of the guideline level and applicable departures therefrom, was not required where the court had determined, after analyzing and applying the §3553(a) factors, that probation was the appropriate sentence, and the five year sentence was beyond the guideline range proposed by the government.) The language from *U.S. v. Laufle,* 433 F.3d 981, 987 (7th Cir. 2006) provides the guidepost:

> Now that *Booker* has rendered the Guidelines advisory and District Courts have much broader authority to sentence outside the recommended range, departures are beside the point.  The District Court's obligation in every instance is to consult the Guidelines and, taking into account the sentencing factors in section 3553(a), to impose a reasonable sentence.

The government and the Defendant disagree on the appropriate offense level per the United States Sentencing Guidelines. The government's position is that the Defendant is properly slotted as a first offender at offense level 28.  The Defendant believes he should be initially slotted as a first offender at offense level 13, which takes into account reductions/departures from the Probation Office's calculations based on: the scheme not being his (two levels), his minimal role (four levels); the bankruptcy court assessment (two levels)[7], his extraordinary charitable works (up to five levels) and his indispensible

---

Simplon went directly to the lender, and for that reason, instructed Lewis to draft a Non Circumvention Agreement for Simplon to sign.  The Non Circumvention Agreement was drafted by Lewis, but not signed by Simplon, and the deadline for the court's requested disclosure passed without further filing by Canada.
[7] See also, 18 U.S.C. § 3553(a)(6).

place in his family (two levels).  The Defendant should also be considered for an additional two level reduction based on his efforts and continuing commitment to cooperating with the government,[8] thereby reducing his ultimate offense level to 11.

The genus of the disagreement between the government and the Defendant does not appear to be primarily focused on a dispute as to what the Defendant did,[9] but rather, on what conclusions should be drawn from his conduct as to the Defendant's involvement in Canada's scheme.  In order to get to those conclusions, it is imperative that the court understands what motivated Chip Lewis's conduct.

1.     THE GOVERNMENT'S POSITION

The government believes Chip Lewis had actual knowledge of the Canada scheme and had a financial incentive to keep it going.  In support of its position, it points to Lewis's misrepresentations to certain attorneys, borrowers, and the bankruptcy court in California.  It also argues that Lewis lied to the FBI in 2007, when he told them Trinity Trust changed to Providence Funding because Trinity Trust never really got going.

Much has already been submitted by both sides regarding Lewis's FBI statement.  However, the timeline that gives rise to this analysis needs to be considered.  Trinity Trust changed to Providence Funding in 2005.  The FBI met with Lewis for about thirty minutes.  Lewis was not pressed on the question and was not given an opportunity to

---

[8] This issue was not raised in Defendant's objections to the PSR, but is raised herein, in anticipation of the government's failure to bring a §5K.1.1 motion while at the same time admitting that the Defendant has done all that he can to cooperate.  Moreover, the Defendant wants the court to know that he will continue to cooperate with the government to the best of his ability and as the government sees fit in matters related to this or any other case deemed appropriate by the government or the court.  This continuing commitment could take the form of speaking to local, state and national bar associations about his mistakes and developing protocols for other attorneys to avoid the same

[9] To be sure, there remain some factual disputes, such as the issue of Lewis's statement to the FBI.  By and large, however, the parties have agreed that Lewis's misconduct occurred when he misrepresented closings, assisted Canada's obfuscation to the bankruptcy court, vouched for Canada, and consciously avoided numerous red flags about Canada's scheme.

review the FBI's notes of the meeting or confirm their accuracy or comprehensiveness with regard to the question posed.  In April 2010, AUSA Schmid again raised the issue and this time under the more formal setting of a sworn statement.  Lewis's 2010 recollection of the reason for the corporate change that was provided to him by Canada in 2005 was challenged by the AUSA.  In the midst of that challenge, Lewis did not dispute or argue the FBI's recollection of the 2007 interview or the notes they took from the same.  Rather, he agreed that the FBI notes of what he had said must be accurate.

When asked why he responded that Trinity Trust never got going, when he knew Trinity had taken in advance fees and employed several people, Lewis, with his memory refreshed about the things that led up to the corporate change, explained his earlier comments to the FBI, this time in greater detail, and reconciled the reasons given to him by Canada for the change; namely, that Trinity never "got going" in terms of closing loans, and a new lender, Bond Street Capital, wanted a relationship with a new entity, not one, like Trinity, that had a track record of not closing loans.

At all phases, Lewis has taken responsibility for this misunderstanding, but he has not admitted to, and cannot admit to, lying to the FBI.  And while it agrees with the U.S. Probation Office's report that this issue is immaterial for purposes of an obstruction of justice sentencing enhancement, the government has nevertheless been unable to let go of this bone, as it's interpretation of this incident appears to fuel its belief that Lewis adopted Canada's scheme as his own, and then was an active participant in it.

2.    DR. SIBILLA'S REPORT

Dr. Warren Sibilla conducted a Diagnostic Psychological Evaluation of Chip Lewis, which is attached hereto, without objection from the government as Exhibit 1.  Dr.

Sibilla saw and assessed Mr. Lewis on three separate occasions, September 5, 16 and 20, 2011.  Dr. Sibilla's report, and his anticipated testimony at the sentencing hearing, are proffered to the court not to excuse or minimize Chip Lewis's conduct, but rather to explain and better understand it.  Utilizing the "gold standard" personality inventories in the field, the Millon Clinical Multiaxial Inventory – III, and the Minnesota Multiphasic Personality Inventory – 2, (along with the Sympton Checklist-90-Revised, scaled primarily for depression), Dr. Sibilla confirmed that Lewis possesses elevated patterns for Narcissistic Personality and Desirability Index.

In a nutshell, Dr. Sibilla explains that in Canada, Lewis found his personality opposite, which made Lewis uniquely vulnerable to believing everything Canada told him.  Not only that, it made Lewis very susceptible to doing and saying just about anything in defense of his client; the defense itself being that which provided Lewis meaning and value.  Dr. Sibilla's report explains not only how Lewis could have marched in lock step in his defense of Canada in the face of so many red flags, but also how Lewis could have misrepresented the truth without actually having an ulterior motive to lie to anyone or to do anyone harm.  As Lewis himself alluded to in his sworn statement, once he determined that the borrowers were bad or at fault, and that the assaults on Canada were unfair, everything else just became background noise for him.

The surface level irony, of course, is that these same personality traits are the ones that motivated Chip to become a community steward, a model husband, father and family man, a member of so many not for profit boards, and a fixture volunteer not only at his parish and kids' school, but in virtually every aspect of their lives.  Lewis's actions on behalf of Canada represented the other side of the coin of his personality.  And while the

two sides are not evenly weighted, Dr. Sibilla's report explains how Lewis, who strongly desires to be virtuous, and thereby engages in so many virtuous acts, could also become caught up and taken in by Canada, who desires nothing more than his own gratification, and who has spent a lifetime preying on others in order to obtain that gratification.

Dr. Sibilla's report also explains how Lewis's propensity to black and white thinking opened the door to conduct that others, who do not know Lewis well, would deem to be arrogant. Those who know him well say Chip Lewis is the least arrogant person they know, and his willingness to take on even the lowest level tasks in loving support of his family, school and church, bear this out. But for those who have only been exposed to the "when I'm right I'm right" attorney Chip Lewis, it is not unexpected that they would sense arrogance.

3.    <u>ANALYSIS OF THE TWO POSITIONS</u>

The government argues that Chip Lewis made misrepresentations in order to cover up the scheme in which he had become actively involved. This argument runs contrary to Dr. Sibilla's professional assessment, but also to the facts. First, there can be no ignoring that such an active involvement in Canada's scheme would necessarily have netted Lewis more than just his attorney's fees. Rather, he would have commanded a percentage of the take, as was provided to Canada's partner/associate, Bob Miller. It is impossible to reconcile the financial benefits Lewis received from Canada with an argument that Lewis was part of the scheme, especially when it is admitted that Lewis was suffering from financial difficulties.

Secondly, Lewis played no role in finding new clients for Canada. If he were an active participant in Canada's scheme, and motivated by money coming in from it, he

would have necessarily played a role in finding new sources of income.  Instead, he only and always took his direction from Canada.  He only worked on matters Canada gave him to work on, and he was completely unaware of about seventy (70%) percent of Canada's transactions.  Canada was an outside client who provided Lewis work on Canada's schedule, not on Lewis's.  Lewis had no control over the customers Canada took in or the types of deals he ostensibly got into.  Indeed, the extent of Lewis's input on this point was to generally advise Canada to stay away from bankruptcy cases, because the creditors, who were the impetus for the bankruptcy, made the difficult transactions even more difficult by their opposition to the possibility that their liens would become secondary to this Johnny come lately lender named Barney.

Third, Canada took in his advance fees long before Lewis was ever asked to get involved in a transaction.  The *Simplon* case is instructive.  Lewis was carbon copied on an email on May 24, 2008 that Canada sent to Attorney Thomas Nelson and a broker associate of Nelson's in California regarding Canada's first declaration.  Lewis had no idea what the declaration was, who Nelson was, or what the deal was about.  Some weeks later, Canada enlisted Lewis to get involved in the transaction, but this was long after Canada had met and worked with Nelson and the broker in California and had secured advance fees from Nelson or his client.

Finally, Dr. Sibilla's assessment of Chip Lewis provides a clear and cogent explanation and understanding of Chip Lewis's misrepresentations.  That assessment does not admit of Chip's adoption of Canada's scheme as his own.  Rather, Dr. Sibilla explains how the personality and character traits of a virtuous man with Chip's diagnosis, would <u>necessarily</u> put him on a collision course with the truth when a psychopath like

Barney Canada was involved.  Once Lewis bought into Canada's atonement, Chip's personality would almost guarantee that he would not be shaken from that belief without some form of a major trauma occurring.  That trauma only occurred when Lewis finally realized everything he thought about Canada and his atonement was wrong.  It was at this time that Chip Lewis started the process of dealing with his own "when I'm right, I'm right" black and white thinking.

In a sense, it is understandable that the government would not want to give credence to Dr. Sibilla's findings.  It is second nature to attach ulterior motives to misrepresentations, and the most common of those motives is typically that the person has something to hide.  Dr. Sibilla's report supports so much of the government's theory (namely, that Lewis's arrogance caused his misconduct), and at the same time Dr. Sibilla is able to reconcile Chip's conduct on behalf of Canada with the otherwise overwhelming evidence of Chip's virtuous character, which evidence comes from Dr. Sibilla's testing as well as from the character reference letters that have poured in on Chip's behalf.

Dr. Sibilla has diagnosed Chip Lewis with Narcissistic Personality Pattern.  He explains that those who possess this diagnosis are prone to black and white thinking, arrogance and judgmentalism, but they are also motivated by a desire to be accepted and seen as virtuous.  It is this dichotomy within the Defendant's personality archetype that explains how someone as truly virtuous as Chip can also be the guy who told local attorney Scott Fandre that he had closed a deal for Canada that did not close.  And, Dr. Sibilla's assessment explains what the government's position cannot; namely, how Chip could make misrepresentations on Canada's behalf without possessing the motive to do

harm, and without taking a percentage of the ill gotten gains of the one, Canada, who

possessed and acted upon that harmful desire.

### III.  THE 18 U.S.C. § 3553(a) FACTORS

In pertinent part, 18 U.S.C. § 3553(a) provides:

(a) Factors to be considered in imposing a sentence. – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider -
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to criminal conduct;
  (C) to protect the public from further crimes of the defendant; and
  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;…
(6) the need to avoid unwarranted sentencing disparities among defendants… found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

### 1.      Nature and Circumstances of the Offense

Chip Lewis was involved in a small percentage of Barney Canada's 100 plus

advance fee transactions.  He was paid his hourly rate for his work.  *See, U.S. v. Samaras,*

390 F.Supp.2d 805, 810 (E.D.Wis. 2005)(downward departure granted in part based on

fact that defendant did not profit more than he normally would have for legitimate

business operations).  His involvement always occurred after Canada had taken in the

advance fees.  But he did not devise or set up the scheme.  He did not solicit new

business, and had no role in finding new prospects.  Nor did he get involved in a single

transaction unless Canada hired him to do so, and he did not create the checklists Canada

used to put people off.  Those checklists were created and monitored by Canada's due

diligence staff, and from 2008 forward, that person was Certified Public Accountant Larry Parks.  Lewis incorporated new entities for Canada, and when he did so, he filed papers with the Indiana Secretary of State's office indicating Canada's continued involvement, ownership and participation in those entities.

Chip Lewis consciously avoided the red flags that were waving in front of him, and he crossed over the line in his representation of his client when he vouched for Canada (on several occasions) and when he misrepresented that Canada had closed loans. While Lewis's conduct did not bring more money into Canada's scheme, it is true that potential borrowers and their counsel incurred additional transactional costs moving forward with non-existent loans after Lewis got involved, thereby adding to the losses the victims had already sustained.

> **2.      History and Characteristics of the Defendant**

The history and characteristics of Chip Lewis are best gleaned from the letters written on his behalf, which have been separately submitted to the court.  Many of those letters were submitted to undersigned counsel through email, without the capacity for scanned signature.  Summaries from many of those letters, provided below, speak clearly to the characteristics of Chip Lewis.

<u>LETTERS FROM FRIENDS:</u>

Pam Regnery writes that Chip freely gave of his time to minister to their family when she and her husband Alex suddenly lost their fourth child, James, to SIDS.  He was the person they called when Alex was first diagnosed with leukemia.  Chip helped bring the Regnery family through some of the darkest moments of their lives.  So deep is their

trust in Chip that the Regnery's made him the godfather of their daughter.[10]  Also, as an ambassador for the community, and a person so deeply embedded in the city's and the community's growth and development, Chip helped Pam to see South Bend in a new and positive light.  Alex Regnery echoes these sentiments about Chip's virtue, genuineness and commitment to his family and to charitable works.

John Doe, whose real name will be provided to the court under seal in order to protect the confidential juvenile record of his son, writes about Chip Lewis being a man of mercy and forgiveness.  His letter speaks to the Chip Lewis who seeks the good in others, and who seeks to be good and virtuous in his dealings with others.  In this matter, Chip was much more than merciful.  He and his wife took the opportunity to minister to the young man and to deepen their relationship with the young man and his family… taking the initiative to forgive, heal and then grow in abiding faith with his neighbors. This letter and the events that led to it, provide powerful testimony to the Chip Lewis who truly seeks to live a virtuous life before Christ.  *See, Samaras, Id., see also, U.S. v. Tomko,* 562 F.3d 558 (3rd Cir. 2009)(probationary sentence in tax evasion case justified by defendant's lack of criminal history, community ties, employment record, and charitable works), *U.S. v. Smith,* 359 F.Supp.2d 771 (E.D.Wis. 2005)(family involvement, personal character and church attendance were factors considered in support of downward departure), *U.S. v. Howe,* 543 F.3d 128 (Del. 2008)(probation granted based on the following factors:  lack of criminal history, status as actively involved father, and involvement in church and community activities).

---

[10]  In the Catholic faith, at the Sacrament of Baptism, the godparents swear before God to raise the baby as their own and in the faith, if something were to happen to the parents.  They also swear to always be a strong and continuing example of Christ's love in the life of their godchild.

Catherine Dale describes how Chip offered compassionate help when her husband Gregory faced bladder and kidney cancer.  Gregory writes about Chip's involvement in his family and as a volunteer on numerous civic boards.  Mary Nucciarone describes Chip as a mentor to her daughter, and a good man who has blessed the lives of many. St. Joseph High School Assistant Principal Marty Harshman and his wife Katie share many examples of Chip and Ana Maria Lewis's random acts of kindness and genuine service.  Sometimes those acts included cooking meals for the Harshmans after the birth of a child, and other times they were less noticeable, but equally appreciated, like saving seats in the pew for Christmas Eve Mass.

South Bend City Councilwoman Ann Puzzello describes Chip as a respected attorney, friend and community leader, and indicates that he has truly been a good citizen for South Bend.  Pete and Lisa Redden describe Chip as a great servant to his family and his community, and say he is the kind of parent you hope to get on your kids' sports teams.  Brendan and Jean Krumlish point out that Chip is the volunteer who works the thanksless jobs.  Maureen Hamel, Assistant Principal at St. Joseph Grade School, echoes the Krumlish's sentiments, and points out that Chip is always just a phone call away when the school is short of help.

Charles (Chuck) and Joan Lennon, who have known Chip since he was a child, point out how deeply committed he is to his community, and how terribly important he is to his family.  Dr. Christopher Quinn describes Chip as being devoted to his community and possessing a passion for improving the world around him, all with an eye toward improving life for his family, to whom he is deeply devoted.  Tim Sabo describes Chip as a man of honor, compassion and kindness.

Mark Carney and Kristin Darden know Chip as a strong and devoted family man who is committed to his church and school.  Like so many others, they have wrestled with making sense of the fact that the Chip Lewis they know and love now faces sentencing on federal mail and wire fraud charges.  Christina Govorko indicates that Chip Lewis is always willing to help out in the classroom, and says the family bond that the Lewis's possess is one of the most incredible she has ever witnessed.  Jennifer Mayhill writes about how she has personally witnessed Chip's commitment and dedication to his family, and describes him as an amazing son, father and husband.

Clinical Social Worker M.J. Murray writes in depth about Chip Lewis's virtue, and about how his particular personality traits, including his deep faith, his propensity to black and white thinking, and his sense of strongly held convictions, all caused him to develop a distorted loyalty for Canada.  She goes on to write about the growth and awareness she has seen in Chip, along with the immense amount of suffering he and his family have already endured from this.  Retired Attorney Thomas Murray, who only recently met Chip, also describes, from personal experience, just how manipulative Barney Canada was, and asks the court to consider all of Chip's career of good works and community service when fashioning a sentence.

Sister Louise Akers describes Chip Lewis as being "other centered" and being a man who is immersed in family and civic life.  Those same sentiments are shared by so many others.  A partial list is included below, with a summary of their comments on Chip Lewis's character in parentheses:

- Doug Kaczorowski (above all, a family man),
- Ken and Lisa Putz (a lifetime of service and a pillar of his church),
- Jeff Breiler (serves the community by tireless volunteerism),
- Merryl Sherwood (always willing to lend a helping hand),

- Thomas Labuzienski (a positive and nurturing force in his family),
- Gig and Mary Young (a community leader and devoted family man),
- Rachael Schroeder (a family of Christian stewards),
- Emeric Szalay (a true civic leader and family man),
- Samuel Miller (a family man and community servant),
- John Chaussee (most unselfish person he has ever met),
- Timothy Gray (one of the most sincere family men he's ever met),
- Douglas White (a man who always gives back to his community),
- Gregory Dale (a sincere and honest attorney),
- E. Ali Noudjami, Esq. (an ambassador for the community he serves),
- Terry and Laurie McFadden (a loving and committed father),
- Jerome Kearns (a generous person, dedicated husband and father),
- Tim Lemacks (a skillful attorney and strong family man),
- Dr. Thomas Troeger (has given generously to our community),
- Matt Kahn (a servant to his family and his community).

<u>LETTERS FROM FAMILY</u>

The letters from family reveal Chip Lewis to be a deeply devoted son, brother, husband and father whose role and place in his families' lives goes well beyond the norm. In the midst of this ordeal, Chip is also bearing the weight of his father's radiation treatments, and doing so in the same way that he has approached so much of his life… with faith and in service.

Those who know him well characterize Chip Lewis as a compassionate and committed man whose resume of charitable works, attached as <u>Exhibit 2</u>, is extraordinary.  Whether through a five level guideline reduction pursuant to U.S.S.G. §5H1.11, or an 18 U.S.C. §3553(a)(1) assessment of the defendant's history and characteristics,[11] sentencing courts have always taken account of charitable works.  *See, for example, U.S. v. Mehta,* 307 F.Supp.2d 270 (D.Mass. 2004)(five level guideline level reduction for charitable or public service and similar prior good works), *U.S. v. Greene,*

---

[11] *See, U.S. v. Miranda,* 505 F.3d 785, 792 (7th Cir. 2007)("… the district court may apply those departure guidelines by way of analogy in analyzing the section 3553(a) factors.")

249 F.Supp.2d 262, 264-66 (S.D.N.Y. 2003)(seven level reduction for extraordinary charitable works and family circumstances).

There is an aspect of the Defendant's personality, particularly manifested in his professional life, that can fairly be described as arrogant. Chip has admitted as much. But he has done so much more than that. Of his own volition, Chip allowed himself to be assessed by Dr. Sibilla, who returned an assessment that in some ways in not flattering. He has then submitted that assessment to the court and the government for public scrutiny, not because he desires to excuse or defend his mistakes, but rather, because he desires that the court and the government understand them and him better.[12]

### 3.   Seriousness of Offense, Respect for the Law, Just Punishment, Adequate Deterrence, and Protection Against Further Crimes of The Defendant

A sentence of probation or home incarceration will accomplish the statutory goals in this case. The public and the courts are entitled to expect that lawyers will, at all times, act honestly, thoroughly and independently in all their dealings, and that alone makes Chip Lewis' illegal conduct serious. For his failure to do so, Chip Lewis will walk out of the sentencing hearing no longer able to fulfill his life's dream and career mission, to practice law. In this regard, specific deterrence has already been served, and society needs no further protection from recidivism. *See, U.S. v. Carter,* 538 F.3d 784 (7th Cir. 2008)(87 month guideline level reduced to 24 months based on the defendant's unlikelihood of committing any future crimes).

---

[12] Compare Chip Lewis's conduct with the actions of Barney Canada. Lewis has been torn in two by the reality that his actions helped to take money away from others. He has sought to understand himself and his actions better, and has committed to dedicating the rest of his life not only to making restitution to the victims, but also to changing that part of his personality that caused him to get to this place. In contrast, Canada immediately copped the best deal he could, and crawled back into his sociopathic hole, where self-awareness does not exist, and all that matters is gratification at the lowest cost.

With regard to general deterrence, undersigned counsel can only report to the court, from personal observations, that the Lewis case has sent a rippling shock wave through the local bar.  Many, perhaps most, local attorneys know about Chip's interactions with and misrepresentation to, Scott Fandre, and their response has been universally the same.  To paraphrase the response of one local practicioner,  "Wow, what was he thinking?  We all have to deal with the boundaries of our representation of our clients, and that's not an easy task.  But you can't do that.  When I heard about Chip's interactions with Scott Fandre, I thought, 'you just can't do that.'"   In short, the local bar understands the gravity of Chip's conduct. Chip Lewis fully understands the seriousness of his conduct, and the fact that negative consequences must flow from that conduct.  He wants nothing more than to do everything within his power to repay his debts to society.

In all of this, Chip Lewis has been humbled.  He has looked inside himself to find a man whose arrogance got him in trouble and has brought him to his knees.  Chip now finds himself wearing the label of a criminal.  Remorse accompanies his daily and hourly walk.  Many people have struggled to reconcile the virtuous Chip Lewis with the man who stands before this court for sentencing, and several letters of support have not been presented to the court because their authors simply could not get their hearts around the fact that Chip could have done anything illegal.  This is not because Chip Lewis has proclaimed his innocence or minimized his misconduct.  Nor is it because there was a darker and sinister side to Chip that others did not know, a double life or alternate personality, if you will.  Rather, as Dr. Sibilla reports, the same personality traits that have always motivated Chip to strive for virtue also caused him to cross the line in his representation of Canada.

### 4.        Kinds of Sentences Available and Restitution

Pursuant to 18 U.S.C. §3561(c)(1), probation alone would not be available to Chip Lewis if he were sentenced pursuant to offense level 28 of the guideline range. However, straight probation would be available to him at offense level 25 or below. Moreover, per *Booker,* the court is not locked in to sentencing Lewis within the sentencing range, whatever that level is ultimately determined to be.

There are five reasons for the court to sentence Chip Lewis to straight probation, whether or not it determines a variance is required in order to get to that place.  First, Chip's personality traits caused his misconduct. He did not possess what is normally thought of as the typical scienter.  To be sure, under the law he is not, cannot be, and does not request to be, excused from accountability for his actions, and in that regard he does not offer a defense to the charges to which he pleaded guilty.

With that said, Dr. Sibilla's report brings deeper understanding to this difficult matter and provides the court with reasonable grounds to sentence Mr. Lewis to probation.  There is precedent for considering Chip Lewis's psychological state when sentencing him to probation, without that state being offered for, or considered as, a defense to the charges.  Attached as Exhibit 3, is the Martinsburg, West Virginia Journal News online article dated January 26, 2011 "Former defense attorney sentenced in fraud case" wherein it is reported the federal district court sentenced defense attorney Heidi Janelle Silver to five years probation in aiding and abetting mail and wire fraud conviction in which she concocted, manages, and profited from the scheme.[13]

---

[13] In addition to her significant cooperation with the government, the court cited the following factors in reasonably coming to its sentencing decision, including that her offenses were non-violent, she lost her law license, her profession and her reputation, and was undergoing psychological treatment.

Secondly, Chip's lifetime commitment to service to his community should be taken into consideration. *See,* Exhibit 2. *See also, U.S. v. Mehta* and *U.S. v. Greer, supra,* and *U.S. v. Willis,* 70 F.Supp.2d 927 (E.D.Wis. 1999)(Where minimum guideline sentence was five years, defendant sentenced to twelve months and a day based on her character, community support and involvement, and unlikelihood of recidivism).

Third, Chip's role and place in his family are extraordinary, such that his removal from his family will have an extremely devastating effect on his wife and kids.  They face enough challenges in dealing with the fact that their father, a pillar of the community and hero in their home, has been publicly humiliated in all of this. Removing Chip from the home will devastate many innocent people.  See, *U.S. v. Greene,* at 266, *supra* (downward departure focus of inquiry is on the hardship incarceration would impose on those dependents), and *U.S. v. Greer, supra.*

Additionally, there is no chance of recidivism in this case.  *See, U.S. v. Carter, supra.*  Lewis will no longer practice law.  He is embarking on a path of self-examination and growth to assure that, with his personality traits, he will never again find himself in this kind of situation, which only occurred once in his professional life.  He desires to make amends to the victims and is situated to make meaningful restitution.  He has been offered not only a job, but a new career, by the President of a leading local business.[14]

## CONCLUSION

Punishment (Retribution and Deterrence), Restitution and Rehabilitation are best served by a sentence of probation.  Both general and specific deterrence have already

---

[14] Attached as <u>Exhibit 4</u> is his employment offer and contract with WISSCO, which offers a base salary and the possibility of financial increases, to possibly be applied to the restitution in this case.  Attached as <u>Exhibit 5</u> is a proposed preliminary budget from the Defendant indicating the amount of restitution payments he could possibly make pursuant to his WISSCO contract.

been served.  Chip Lewis will walk out of court on November 7, 2011, no longer licensed

to practice law.  The legal community has been shaken by this case, not because Chip did

not do anything wrong, but because he did.  Attorneys are at the height of awareness of

how they represent their clients and how they comport their conduct, representations and

pleadings, both to each other and to the courts.  No restitution will come from Barney

Canada, and none can come from Chip Lewis if he is incarcerated.   No penal or

rehabilitative purpose will be served by incarcerating the Defendant.  Thomas F. "Chip"

Lewis, by counsel, respectfully requests a sentence of probation in this matter.

Respectfully submitted,


/s/  Thomas M. Dixon_____
Thomas M. Dixon, Esq. (18611-71)
Dixon, Wright & Associates, P.C.
55255 Birchwood Court
Osceola, IN  46561
(574) 315-6455
email:  tdixon3902@comcast.net
Attorney for Defendant Thomas F. "Chip" Lewis III
Dated: October 31, 2011

<u>**CERTIFICATE OF SERVICE**</u>

I certify that a true and accurate copy of this pleading has been served upon the
United States Attorney Donald Schmid and upon the United States Probation Officer Lisa
Wirick by electronic filing this 31st day of October, 2011.


/s/  Thomas M. Dixon_____
Thomas M. Dixon, Esq. (18611-71)