

## CDPHC

105 East Jefferson Blvd.
Suite 500
South Bend, Indiana 46601

574-232-4453
574-232-7718 (Fax)

# DIAGNOSTIC PSYCHOLOGICAL EVALUATION

**NAME**:                 Mr. Thomas (Chip) Lewis
**DATE OF BIRTH:**      7/12/62; 49 Years Old
**ATTORNEY**:           Mr. Thomas Dixon, Esq.
**DATES OF EVALUATION**:   09/05/11; 9/16/11; 9/20/11
**DATE OF REPORT**:       10/03/11
**EXAMINER**:           Warren W. Sibilla, Jr., Ph.D.

## FORENSIC CONTEXT FOR REFERRAL:

Mr. Dixon referred his client for a diagnostic assessment. Mr. Lewis, an attorney himself, has pled guilty to becoming involved in an illegal financial scheme by one of his former clients. Mr. Dixon sought out this psychological diagnostic evaluation for his client in an effort to explore the possibility of any potential presentencing mitigating factors regarding Mr. Lewis's present mental status and personality functioning. Therefore, the purpose of this evaluation includes psychiatric diagnostic clarification, personality assessment, and recommendations regarding any necessary treatment considerations.

## THE NATURE OF THE ASSESSMENT AND SOURCES OF INFORMATION:

The interview and assessment of Mr. Lewis took place at the private practice of the evaluating psychologist in South Bend, IN. Mr. Lewis completed the paper and pencil assessment instruments on his own; he required no help or assistance on any item and completed each instrument in a timely manner. There were no unusual disturbances or other disruptions to the assessment process. Dr. Sibilla completed the interviews, evaluation of psychological test data, and wrote the assessment report. The following information and/or data was used to complete this assessment:

### Background Data Furnished by Mr. Lewis to include:

* Email correspondence from Mr. Lewis listing his current medications

### Psychological Test Data to Include:

* Millon Clinical Multiaxial Inventory (MCMI-III)
* Minnesota Multiphasic Personality Inventory-2 (MMPI-2)
* Symptom Checklist-90-Revised (SCL-90-R)



EXHIBIT
A's 1

**Statement of Confidentiality**:

Mr. Lewis was made aware at the outset of the evaluation that this assessment was initiated by his attorney for the purpose of exploring any possible presentencing mitigation factors present in his psychological functioning; that the purpose of the evaluation is to provide specific clinical information to his lawyer to better aid Mr. Dixon in his professional service provision to the defendant. Mr. Lewis shared his understanding of this information and thereafter indicated his willingness to participate. Mr. Lewis also signed a formal release of information such that this information could be made known to his attorney and through his attorney, to the Federal Court and its agents.

**Statement of Completeness**:

This report and the professional opinions expressed herein should be considered final in as much as they represent the author's position regarding the background information made available by the time this evaluation was completed and its integration with the psychological data generated in this assessment. This psychologist reserves the professional right to amend this report should any additional background materials not noted above come to light in the process of discovery and/or throughout the duration of Mr. Lewis's association with Mr. Dixon in regards to this legal matter.

## HISTORY:

### Early Childhood:

Mr. Lewis reported no knowledge of any complications or difficulties during his mother's pregnancy for him or during his birth and delivery. He met the expected physical developmental milestones without incident and thus participated in no form of early academic remedial intervention. The oldest of five children born to his parents, Mr. Lewis remained in South Bend until he left to attend Indiana University in Bloomington as an undergraduate student. He reported experiencing no unusual childhood experiences including no form of abuse, neglect or other traumata during his formative years. Lastly he reported a strong relationship to the church as a child, adolescent, young adult, and throughout his adult years.

### School History:

Mr. Lewis was graduated from St. Joseph High School and thereafter completed his undergraduate baccalaureate degree from Indiana University in Bloomington, IN. He then was accepted into the University of Notre Dame Law School, from which he was successfully graduated. Mr. Lewis accepted his first professional post-graduate employment at a legal firm in Cincinnati, OH. While in Ohio, Mr. Lewis met his wife-to-be. After nine years in Cincinnati, Mr. Lewis and his wife returned to South Bend to raise their children.

### Medical History:

Mr. Lewis was diagnosed with high blood pressure, which has been successfully managed with medication. Otherwise no significant medical history was reported including no history of central nervous system infection, insult, trauma, or injury; no history of untreated high fevers or seizure activity; no history of severe headache or any experience of sensorium disorientation/syncope. He reported no history of serious illness or surgery and no history of difficulty with memory. Mr. Lewis reported recent difficulty with his sleep onset attributed to psychosocial stress but

otherwise shared no longstanding difficulty with his sleep onset, maintenance, or early morning awakening. Mr. Lewis is presently taking the following prescribed medications: Isosorbide, Crestor, and Lisinopril (all for high blood pressure and taken for some time); he also takes Citalopram (for depression) and Zolpidem (sleep aid)- both of which were initiated in August 2011.

**Psychological Treatment History**:

Mr. Lewis reported one previous period of depression (2002) during which he began taking an anti-depressant medication and sought outpatient care at Madison Center- both of which he indicated were very helpful. During this interview, Mr. Lewis reported the following symptoms associated with a formal mood disorder:

- Depressed mood
- Sleep related difficulties
- Loss of energy
- Loss of enthusiasm for otherwise pleasurable activities
- Sense of foreshortened future

These symptoms had their onset at or about the time of Mr. Lewis being formally charged (May 2011) and are consistent with a formal diagnosis of Major Depression.

Mr. Lewis reported that he consumes beer on a social basis and denied any history of abuse, dependence or legal difficulty associated with his alcohol consumption. No use of illicit psychoactive substances was reported. Finally, no other psychiatric history was endorsed or reported.

**Legal History:**

Save for the present charge, Mr. Lewis reported no other legal history or involvement with the legal system as a defendant.

**Work History**:

Mr. Lewis has worked as an attorney for twenty-four years.

**Intimate Relationship History:**

Mr. Lewis is married to the mother of their three children (ages 16 years, 13 years, and 11 years). The couple has been married for nineteen years. Mr. Lewis shared that his marriage is quite strong and a source of solace and strength for him.

**Community**:

Mr. Lewis reported a very strong commitment to his local community saying, "I want my town to be the best it can be. People need to be involved to make it the best it can be and I want to be that person." To that end, he has served the community in the following ways:

- Board of Directors - Madison Center
- Board of Leadership - South Bend/Mishawaka
- Board of Directors - Downtown South Bend

3

- Board of Directors - Transpo
- Board of Directors - Fischoff Chamber Music/South Bend Symphony
- Board of Directors - Neighborhood Resource Corporation
- South Bend Chamber of Commerce
- South Bend Civic Theatre
- St. Joseph Church:
  Parish Counsel
  New Parishioner Committee
  Hospitality Committee
  Volunteer Recess Monitor
  Soccer Coach (8 years)
  Baseball Coach (8 years)

## MENTAL STATUS AND BEHAVIOR DURING ASSESSMENT PROCESS:

Mr. Thomas (Chip) Lewis was interviewed and completed the assessment instruments at the
private practice of the evaluating psychologist in South Bend, IN over three extended sessions.
He presented himself dressed in business casual clothes and was at all times well groomed. He
demonstrated no difficulty engaging in the interview or the tasks of the assessment. That is, he
was pleasant, answered each question asked of him with no hesitation, and thoroughly completed
each instrument in a timely manner. In this manner, Mr. Lewis gave clear evidence of reliable
and consistent reciprocal behavior throughout the entirety of the assessment process. Thereby, he
demonstrated competent sensorium orientation to person, place, time and situation. His thoughts
throughout the entire evaluation and assessment were generally coherent and topic-specific with
no unusual or odd associations. There was no immediate evidence of Mr. Lewis attending to
unusual internal stimuli (e.g., auditory and/or visual hallucinations) during the entirety of the
assessment process. Also, there were no grossly abnormal interpersonal mannerisms. There was
no evidence in his presentation consistent with marked paranoia or gross interpersonal anxiety.
Thus, in the absence of any hallucinatory activity, delusional beliefs, odd interpersonal
mannerisms, or clinical paranoia, Mr. Lewis demonstrated no immediate or apparent evidence of
frankly psychotic or delusional behavior throughout the entire evaluation period. His thoughts
were goal-directed and topic-specific with no episodes of losing track of the conversation or other
examples of improperly attending to the examination. His mood was dysthymic with congruent
affect. His speech was delivered at a conversational volume and was always characterized by age
appropriate vocabulary and without immediate evidence of any marked developmental speech
delay or disorder. The content of his speech was at all times appropriate to the conversation topic
with no use of street slang or foul language. His interpersonal behavior was warm and respectful
of the assessment process. Therefore, with respect to the defendant's presentation style and test
taking behavior, these assessment results can be considered a valid representation of Mr. Lewis's
present psychological and cognitive functioning.

## PERSONALITY AND EMOTIONAL ASSESSMENT:

Mr. Lewis's personality and emotional functioning were measured through the use of the Millon
Clinical Multiaxial Inventory-III (MCMI-III), the Minnesota Multiphasic Personality Inventory-2
(MMPI-2), and the Symptom Checklist-90-Revised (SCL-90-R). The following clinically
significant elevations were noted:

4

**MCMI-III**:

Desirability Index (BR Score=80)
Narcissistic Personality Pattern (BR Score=83)
Major Depression (BR Score=81)

**MMPI-2**:

Scale 6 (Paranoid Anxiety; T Score=86)
Scale 2 (Depression; T Score=70)
Scale 3 (Hypochondriasis; T Score=69)
ANX (Anxiety Subscale; T Score=65)

**SCL-90-R**:

Global Symptom Index (T Score=71)
Depression (T Score=81)
Phobic Anxiety (T Score=69)
General Anxiety (T Score=68)
Interpersonal Sensitivity (T Score=67)

*Integration/Discussion*:

Review of the scope and breadth of the elevation patterns on Mr. Lewis's protocols indicates he is experiencing no less than a moderate level of chronic as well as acute psychological distress. Individuals with similar character structures are typically characterized as especially self-confident, self-assured and singularly focused on accomplishments. When taken to extremes such attributes may equally well be characterized as arrogant, self-focused (to the exclusion of others), and belittling to those that do not share the same perspective and goal. That is, with this character pattern one's own sense of themself and their self-esteem is largely a product of being seen as competent, admirable, and idealized for one's accomplishments and lot in life. When such accolades are absent and/or others do not mirror back the expected high praise, such individuals tend to be quick to anger, overly punitive, judgmental, and condemning- certain that the fault lies with "the other" and not with them.

Most of our present day character patterns have their origin in ancient culture and the narcissistic character certainly shares this lot. The Greek God Narcissus was noted for his beauty, intelligence, and accomplishments. The difficulty for Narcissus was that he was not able to experience any of his acumen unless those in his company reflected it back to him. In the now classic scene, Narcissus, standing on the water's edge, views an image of himself reflected back to him by the water longing to be able to see worth and value in himself. Unable to do so, he becomes distraught until a female nymph named Echo, who hides herself in foliage near the water's edge, gives voice to what apparently is missing in Narcissus. That is, like a uniquely metered lock and key, Echo is able to manipulate Narcissus in her seemingly unique ability to mirror back to him what he seemingly cannot see in himself. Thereafter, a Narcissus character becomes forever and fatefully linked with an Echo character failing to see that he is artificially and therefore fatefully "propped up" by the opinions and reflections of others and consequently missing a grounded sense of himself- separate and distinct from what anyone else may perceive.

In this manner, such individuals demonstrate an uncanny knack to wish to be seen in only the most positive light spending great amounts of energy to assure all those who may be in doubt of their value and worth. The fly in the ointment of this interpersonal character strategy is that in the process of being seen in such virtuous light, one does not take account of the fact that they also have a shadow side. On the contrary, any so-called negative character traits, traits that are perceived to be less than stellar, are typically and habitually projected onto those individuals who fail to match their grandeur. By failing to take account of their shadow, such an individual is uniquely vulnerable to fall prey to someone who may appear to "Echo" back one's value and worth but who instead has ulterior motives and only uses the context of relationship as a ruse for their own self-gain.

That is, Mr. Lewis found in his client his exact character opposite. To the extent that Mr. Lewis was spending his time, talent and treasure enriching his community and priding himself on his selfless acts, it would be reasonable to suspect that his client was equally as involved in selfish acts, serving only himself. Or said differently and more simply, to the extent that Mr. Lewis was busying himself with being "good" he lost sight of his own human inadequacies and limitations. Following the law of human nature, necessarily then Mr. Lewis would be particularly vulnerable (psychologically blind) to an individual who poses as a sympathetic echo but instead is devoid of conscience and any sense of responsibility toward one's community. Moreover, to the extent that he was overly invested emotionally and psychologically in his character pattern, Mr. Lewis would continue to be vulnerable to (manipulated by) such a shadow character until such time as he could gain enough perspective as to sort out figure from ground; until such time as to be able to discern the veracity of his client's story and thereby begin to perceive that neither he nor his client are any less or any more than simply human, with human frailties, faults, and limitations.

Emotionally Mr. Lewis has reported great levels of affective upset. Such emotional distress is entirely to be expected and serves as an indication of the psyche's usual and customary attempts at seeking to maintain its homeostasis and balance. That is, as certain and determined as he must have felt in his defense of his client, Mr. Lewis is now experiencing an equal level of doubt, uncertainty, humility, and desperate need for a new sense of direction and thus, reorientation of his internal psychological compass. Were such doubt and questioning present earlier, it would be reasonable to suggest that Mr. Lewis would have more clearly perceived his client to have ulterior motives- but such speculations are really unfair and solely the province of hindsight's more comprehensive wisdom.

Given his level of emotional upset, Mr. Lewis is in need of comprehensive psychological care to include continued monitoring of his psychotropic medication as well as intense individual psychotherapy. Within such a treatment forum, it would be reasonable to expect Mr. Lewis to explore the origins of his character style, how it has served him well and the ways in which it has brought harm to him and his family. Only in this manner is he and thereby the community given any sense of expectation that he will be less psychologically blind in the years to come.

## DSM-IV DIAGNOSTIC IMPRESSION:

| | |
|---|---|
| AXIS I: | Major Depression, Severe, Recurrent, Without Psychosis |
| | Generalized Anxiety Disorder |
| AXIS II: | Narcissistic Character Style |
| AXIS III: | Deferred to Family Physician |
| AXIS IV: | Present Legal Difficulties |
| AXIS V: | Current GAF: 50 Previous High GAF: 95 |

## SUMMARY AND RECOMMENDATIONS:

Mr. Lewis gives evidence of significant psychological and emotional distress- the nature of which is both acute and longstanding. That is, there is evidence that he has a character pattern that predisposes him to view himself in an especially positive manner and thereby have a distinct tendency to not take account of his human frailties and faults. Consequently, given the psychological fact that each of us has a personality that is whole, what is not seen in oneself must necessarily be seen in someone else. In this manner, Mr. Lewis was especially vulnerable to a client who was as selfish and Mr. Lewis imagined himself to be selfless. Mr. Lewis's affective distress reflects the magnitude of his "fall" from unrealistic and unnatural psychological heights. Given the breadth and scope of Mr. Lewis's protocol elevations, the most efficacious intervention

would be one of intense psychotherapy combined with the necessary monitoring of his psychotropic medications. Given the fact that he has previously found psychotherapy to be quite helpful and the fact that he was so forthcoming and honest in this assessment, knowing full well it would affect his sentencing, Mr. Lewis's prognosis can be said to be quite good were such a treatment forum to be implemented.

Thank you for the opportunity to contribute to your professional work with Mr. Lewis. Should there arise any questions regarding my assessment and the findings herein, and/or a need for this assessment to be represented in Federal Court, please feel welcome to contact me at your convenience.

Respectfully Submitted,

Warren W. Sibilla Jr., Ph.D.
Diplomate Jungian Psychoanalyst
Clinical Psychologist
Assistant Professor of Psychology
The Chicago School of Professional Psychology
Health Service Provider in Psychology
IN License Number 20040799