UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:11-CR-95 RM |
| | ) | |
| THOMAS F. LEWIS III | ) | |
| aka "Chip Lewis" | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

Comes now the United States of America by David A. Capp, United States Attorney for the Northern District of Indiana, by Donald J. Schmid, Assistant United States Attorney, and submits the following memorandum and sentencing recommendation in preparation for the sentencing hearing on November 7, 2011 in this case.

The defendant was charged in a thirteen-count Information. Pursuant to a written plea agreement, the defendant pleaded guilty to all thirteen counts, specifically Counts 1 through 12, wire fraud, and Count 13, mail fraud.

**Section 3553(a) factors**

In analyzing the applicable factors to be taken into account, it is perhaps important to remember that the defendant is to be sentenced for his knowing participation *with intent to defraud* in an extensive and long-running fraud scheme. The defendant used his special skills and reputation as an attorney to advance and promote an extensive advance fee fraud scheme that ruined the financial wherewithal of numerous victims including churches.

Several of the letters written in support of the defendant at sentencing erroneously assert or assume that the defendant was duped by co-conspirator Canada or that Lewis was himself a victim ("no harmful intent on Chip's part," a "victim in this situation, "got [in] over his head," "cannot believe that Chip would knowingly. . .").  He was not.  The defendant acted with intent to defraud over a lengthy period of the scheme and directly made misrepresentations to victims concerning matters within his personal knowledge in order to keep the scheme going.  The defendant was not himself a victim and his repeated acts in support of the fraud prevented the scheme from being uncovered by victims and stopped by the authorities earlier.

*The nature and circumstances of the offense and history and characteristics of the defendant.*

Defendant Lewis was an experienced attorney who possessed special skills.  Lewis first worked for a law firm in Cincinnati, Ohio from 1987 through November 1993 doing bond law and representing public entities that issue debt.  Lewis worked on disclosure issues and document preparation for transactions, bond transcripts, trust indentures, and loan agreements.  Lewis left that firm, and went to work at a bank in Cincinnati in their corporate trust department.  The corporate trust department held funds from municipal bond issues and from the sale of bonds during the construction period in a type of escrow arrangement.  After working at the Cincinnati bank from November of 1993 until February of 1996, Lewis then joined the Jones Obenchain firm in South Bend and remained there until July 31, 2010.  Lewis became a partner there in January 1999.  Lewis left Jones Obenchain as of July 31, 2010 after disclosures concerning the defendant's work with Byron L. Canada aka "Fr. Barney."  Lewis has since then practiced law in South Bend with an Indianapolis-based law firm managed by the defendant's brother.

From 2003 through December 2009, Byron L. Canada aka "Fr. Barney" directed an advance fee scam during which Canada promised to provide various loans and financing for commercial, real estate, construction and other projects in exchange for up-front or advance fees for these loans.[1]  But no loans or any kind of actual financing were *ever* provided.  Utilizing accomplices including Lewis and several companies including Trinity Trust Financial Services Inc., Providence Funding, Inc., and Saint Luke Realty Capital Corp., Canada took in up-front or advance fees from various persons and entities all over the United States who were victimized as part of the scheme.

The modus operandi of the advance fee scheme was that Canada would attract potential borrowers with the prospect of a hard money loan and numerous false promises.  A commitment letter would be drafted and fees ranging from $5,000 to $222,500 would be obtained from victims.  Canada frequently represented that the loan funds were in place.  Canada, Lewis, and Canada's other associates would then string along victims for months, acting as if the promised loan would be funded after documentation had been completed.  Lewis prepared all of the loan closing documents that were sent to victims but never fully executed.  Lewis often wrote to victims telling them things that had to be done or documents that had to be provided in advance of or for the closing.  Victims supplied these and then Lewis came up with more "hoops" for the victims to jump through – some of which made no sense.  In some deals, additional advance fees were requested and provided by victims.  Then, as the promised loan closing date approached or

---

[1]     Canada had a long history of engaging in financial frauds, including advance fee schemes.  Canada's conviction last year for fraud and money laundering in this district was Canada's fourth federal conviction.  Canada's fraud scheme, in which Lewis participated, bore a remarkable resemblance to Canada's prior fraud schemes.  Lewis was aware of this resemblance during at least the latter period of the scheme here.

a period of time otherwise elapsed, Canada and Lewis would then make themselves unavailable. Each would stop returning phone calls and other queries from victims, their representatives, and their lawyers.  Or Canada would refer victims and their representatives to Lewis, who would also eventually stop responding to their queries.  When victims would persist in their communications with Canada and Lewis, Lewis would sometimes threaten in a snitty way to sue or counter-sue any victims who continued to seek the loan or seek further communications with Canada, his companies, or Lewis.

The defendant worked with Canada as his principal transactional and "general counsel" from 2002 through December 2009.  In the website for Trinity Trust Financial Services LLC that helped to attract victims to the advance fee scheme, Lewis' law firm (Jones Obenchain) was prominently listed with its address and phone number as part of "Our Team."  (See attached exhibit.)  That same website represented that 50% of the loan fees would be donated by Trinity Trust to various charities.  This of course was a bald-faced lie.  The website for Providence Funding, Inc., a later corporate vehicle used to further execute the fraud scheme, similarly misrepresented that it was a "faith-based" direct lender (with its own funds) that closed its loans in 7-10 business days.

Canada was a critical client for Lewis' own law practice, providing almost half of Lewis' total annual billings, for example, in 2008 and 2009.  (See attached exhibit.)  Lewis received both hourly and on some deals flat fees for his work on behalf of Canada, his companies, and the scheme.[2]  During the course of the scheme, Lewis' law practice was in decline and revenue from

---

[2]     Lewis had more than 30 separate billing matters for Canada and his companies on which billable time was recorded; Lewis also had more than 90 separate physical files for the various deals and matters for Canada and his companies.

Lewis' participation with Canada's fraud scheme helped keep Lewis' law practice afloat. Lewis also had severe personal financial problems during the time of the scheme. Lewis had declared personal bankruptcy in 2004 and throughout the period of the scheme owed the Internal Revenue Service back taxes in six figures.

From early on, the defendant was aware of numerous "red flags" that indicated that Canada and his associates were making numerous misrepresentations and false promises all for the purpose of obtaining substantial monies under false pretenses. Among these "red flags" were:

- the defendant knew from the beginning that Canada had previously been convicted of fraud and served time in prison for fraud;

- victims and their representatives told the defendant as early as 2003 that they suspected Canada was engaged in fraud and that his loan operation was a sham;

- there was documentation in the possession of Lewis that Canada had falsely represented himself to be a direct lender with his own source of funds;

- the defendant was aware of articles in the press that appeared in 2008 and early 2009 describing Canada's current advance fee fraud and history of advance fee fraud;

- the defendant knew that Canada obtained advance fees in connection with sought-after loan transactions that had no real chance of success;

- the defendant was aware that Canada and his associates made supposititious promises to victims that could not be fulfilled or backed-up;

- the defendant knew no loans were ever closed by Canada or any of his companies;

- Lewis was aware that Canada and his companies had not filed tax returns for years.

5

From at least 2005 through the end of 2009, the defendant looked the other way and consciously avoided learning the full truth about Canada and his advance fee fraud. The defendant's work with and vouching for Canada gave the advance fee scheme a false aura of legitimacy. In furtherance of the fraud, the defendant vouched for Canada and his companies (which the defendant helped to incorporate) despite knowing that Canada had been convicted of fraud and despite knowing that no loans or financing had ever been provided by Canada or any of his companies. As the defendant concedes in his sentencing memorandum, "Lewis became Canada's biggest advocate." (See Defendant's Sentencing Memorandum, p. 3.)

But beyond looking the other way, Lewis himself directly participated in the advance fee scheme and made direct misrepresentations to victims of the scheme and their representatives. The victims of the scheme were told including by Lewis that Canada and his companies had previously closed on loans and financing packages. Such statements were false and the defendant knew these statements were false when they were made.

For example, one of the victims of the advance fee scheme was seeking financing for a real estate development project (the Trump Tower) in Tampa Bay, Florida. Robert Foley was a financial and legal advisor on the project for the developer, Frank Dagostino. Foley spoke with Lewis several times on the phone concerning the project. Foley emphasized with Lewis how critical it was that the financing be supplied in a timely manner. According to Foley, interviewed by the FBI on March 19, 2010, Lewis assured Foley falsely that Providence Funding had found financing for the project. Lewis also told Foley falsely that Providence Funding with Lewis had recently closed loans on similar projects. Foley said that, as the deal was to be finalized, Lewis simply made himself unavailable to Foley. Foley and Dagostino arrived at title company offices

on the date scheduled for the closing but neither Canada nor Lewis showed.  (See attached report of agent interview.)

Another victim of the scheme was BRI LLC.  BRI through its principal Michael Lally attempted to obtain financing for a marina project from Canada and Providence Funding.  Lally was interviewed by the FBI on August 12, 2009 and March 22, 2010.  Lally explained that he spoke with Lewis on the phone several times.  Lewis assured Lally that Providence Funding would be able to provide direct funding for the marina project.  Lewis represented to Lally falsely that he had represented Providence Funding with similar loans that had closed and been funded in the past.  In August 2008, Lewis and Canada stopped returning Lally's phone calls.  Lally then hired a retired FBI agent to investigate Providence Funding and Canada; they discovered that Canada had been convicted of a similar scheme previously and then realized BRI/Lally had been victimized.  Lally told the FBI that he believes that Lewis conspired with Canada in the scheme. (See attached reports of agent interview.)

Similar misrepresentations were made by Lewis to South Bend attorney Scott Fandre of Baker & Daniels, who was employed by Paramount Baptist Church of Washington D.C. Paramount Baptist Church paid $222,500 in advance fees for its financing from Canada and Providence Funding.  The church wired $20,000 in advance fees to Trinity Trust Financial Services, Inc. on April 27, 2007.  Lewis began to work on the matter by October 2007 according to correspondence and Lewis' own billing records.  The church was required to pay another $100,000 to Trinity Trust in advance fees in mid-October 2007.  Then, two months later on December 17, 2007, the Church was requested to pay and did pay another $102,500 to Trinity Trust as a bogus surety bond fee.  These last two payments totaling $202,500 were obtained from

7

the victim church *after* Lewis had become directly involved in the matter.  (Copies of the Paramount payment documents and Lewis billing records attached.)

According to attorney Fandre, Canada and Lewis made unreasonable demands for documents from the Church before the loan could close.  For example, an occupancy permit was demanded even though the financing was for new construction and an occupancy permit could not be obtained prior to completion of construction.  Fandre had an in-person meeting with Lewis on February 8, 2008.  Fandre kept detailed notes of the meeting, copy attached.  During the meeting, Fandre asked Lewis if Canada/Providence Funding intended on funding the loan and whether Providence Funding was a legitimate company.  Lewis assured Fandre that Providence Funding was a legitimate company and represented falsely that he had recently closed numerous loans for Providence Funding, including for a church in Virginia.  The date set for closing passed without any funding.  Fandre demanded the fees that had been advanced by the Church be refunded.  Lewis refused, telling Fandre that no money would be returned to the Church because the Church could not obtain the required documents and permits needed to close the loan.  (See attached report of agent interview and a copy of Fandre's notes of his meeting with Lewis on February 8, 2008.)

Rollie Walker was another victim who received assurances directly from Lewis that the loan promised by Canada would be funded.  Clifford Dunn was an attorney who represented Rollie Walker in his dealings with Canada and Lewis.  Dunn was interviewed by the IRS on April 29, 2010 and FBI on March 8, 2011.  Dunn told agents that he told Lewis that he had suspicions about the legitimacy of Canada's operation.  Lewis assured Dunn that he had represented Canada for years, that Canada was legitimate, and that he would stake his personal

reputation as a lawyer on Canada and his company. Lewis further represented falsely to Dunn that he and Canada had done many deals before all over the country. Dunn asked specifically if Canada had his own money to loan (was a direct lender) or was simply a loan broker. Lewis assured Dunn again falsely that Canada had his own money (that is, he had investors with private money) and that Canada was not a loan broker. Dunn told the IRS that he believed that Canada and Lewis ran a tag team operation, with each of them vouching for each other's statements. Dunn explained that he put a lot of weight on Lewis' representations and allowed the deal to proceed as a result of those representations. (See attached report of agent interview.)

Lewis also made misrepresentations to Daniel Gaquin of Mintz Levin (Boston) in connection with advance fees paid by victim Steven C. Fustolo and his company, The Ocean Club LLC. Fustolo and Ocean Club sought financing for a coastal real estate development project in Revere, Massachusetts. Lewis told Gaquin that he had represented Canada for a long time. Lewis also represented falsely that he and "Fr. Barney" had closed on other deals similar to the Ocean Club real estate development, including a project in California and one in Colorado. (See attached report of agent interview.)

In furtherance of the advance fee fraud scheme, the defendant allowed and helped Canada to misrepresent to victims, their counsel, and other interested persons that Canada and his companies were "direct lenders" with their own source of funds to be loaned. The defendant knew that Canada and his companies never had their own source of funds and had no real capacity to supply the multi-million dollar loans that were repeatedly promised. In particular, the defendant helped to prepare, draft, and file declarations in a court proceeding in which victims, interested parties, and the U.S. Bankruptcy Court in the Southern District of California were

misled in 2008 into thinking that Canada and his companies were capable of providing financing for a large real estate development project when in fact they were not.  The Simplon deal, described in more detail below, is one example of the defendant's participation in the fraud.

Simplon Ballpark, LLC (Simplon) was a real estate development company in San Diego, California.  In 2007, Simplon was developing a valuable waterfront property in the San Diego area when they ran into financial difficulties.  Simplon had already expended over $55 million dollars of its own funds but needed another $30 to $40 million dollars to complete their project. In March 2008, Simplon entered into Chapter 11 bankruptcy in the Bankruptcy Court.  By entering Chapter 11, Simplon was seeking protection from creditors while it sought funding to complete the development project.

In April 2008, Canada was introduced to Simplon as a lender that could provide Simplon with the funding they needed to pay off creditors and complete their project.  Canada agreed to provide the loan through Providence.  Canada received $130,000 in advance fees and attempted to obtain an additional $100,000 in fees throughout the loan process.

On May 24, 2008, Canada submitted a sworn written declaration to the United States Bankruptcy Court in the Southern District of California that, "Providence is a direct lender with its own source of funds.  Providence has the financial capability to fund the loan described in the attached commitment Letter according to its terms."  This false declaration was in Lewis' files and Lewis knew that Providence Funding and Canada were not direct lenders with their own source of funds.  (See attached exhibit.)  Lewis then helped with additional supplemental declarations that falsely suggested that the loan was on track and that closing was near.  On September 2, 2008, for example, in a declaration drafted by Lewis with his own name on the

10

caption of the document, Canada made a further declaration to the United States Bankruptcy Court in the Southern District of California that, "With regard to the source of funding for the Loan, Providence Funding is a correspondent underwriter for a recognized private hard money lender that has funded over one billion dollars in hard to place commercial real estate transactions in the past twenty years." In response to the above declarations, the court asked Canada who the lender was, what loans had they closed and to provide evidence that Providence has closed previous loans. Canada, upon Lewis' advice, would not provide the information requested by the court. (See attached exhibits.) Lewis specifically helped to draft a declaration that falsely denied and misrepresented Canada's prior criminal history for advance fee fraud.

For four months and with the defendant's help, Canada made false declarations to the court and stalled the loan process that was originally scheduled to fund in June 2008. On September 4, 2008, Canada wrote a letter stating that he was stepping down and resigning from the transaction. On October 18, 2008, Simplon went into foreclosure on the above property. Canada did not have the intent or the capacity to fund this loan and Lewis knew this all along. In a sworn statement given to the United States Attorney's Office on April 30, 2010, for example, Lewis admitted that Providence Funding "took in deals that they never should have taken in." He admitted that one of the loans that should not even have been initiated was the Simplon deal. According to Lewis, Simplon was already in bankruptcy, it was a mess from the beginning, and there was "no saving" that deal.

Besides the egregious nature of the fraud, other aggravating factors in this case are the length of time over which the fraud occurred, the number of victims that it ensnared, the type of victims defrauded by the scheme, and the large amount of money taken through the scheme.  The amount of loss in this case for U.S. Sentencing Guideline purposes was $1,524,212.50.  By agreement of the parties, the number of victims directly involved with Lewis was more than 10 but less than 50 (less than the 100 victims of the total scheme).  The scheme began around late 2002 and continued into late 2009.  Numerous persons and entities were victimized after Lewis became aware of the scheme and began directly participating in it.  Some of these victims included religious organizations and churches.

Another factor suggesting the need for substantial criminal punishment is the effect the defendant's fraud had on the victims.  Many financial projects had to be abandoned, causing some victims to lose hundreds of thousands and even millions of dollars that they had already invested in the projects.  Several victims became financially destitute as a result of the fraud.  Some of the victims were charitable and/or religious organizations.

*Lewis' False Statement to Federal Agents*

The defendant was interviewed by two FBI agents as part of the FBI's and IRS' investigation of Canada and the scheme in March 2007.  On March 2, 2007, the day after FBI agents served a grand jury subpoena for documents on Canada, FBI agents Ronald Ryniak and Timothy Theriault interviewed Lewis concerning Canada and his companies.  During that interview, the defendant represented to FBI agents that the first of the corporations used by Canada, Trinity Trust Financial Services, Inc., "never got going."  (See attached report of agent interview.)  That was a lie.  The defendant knew that Trinity Trust Financial Services, Inc. did get

12

going, was in operation from November 2002 until 2005, and had taken in hundreds of thousands of dollars in advance fees from victims. Lewis himself had profited from his work in association with Trinity Trust Financial Services, Inc. during the late 2002-early 2005 period. Then, Lewis helped Canada set up and incorporate Providence Funding, Inc., the company used to execute the fraud scheme from 2005 through 2008.[3]

*The need for the sentence to provide adequate deterrence for similar criminal conduct.*

In addition to reflecting the seriousness of the offense and providing just punishment in response to the defendant's intentional participation in the fraud scheme, the imposition of a term of imprisonment within the guideline range for the defendant would vindicate the interests of society at large, while providing a proper deterrent effect to others who might consider such participation in such a significant and long-term fraud scheme. *United States v. Nagel*, 559 F.3d 756, 764 (7th Cir. 2009) ("Even if there was no need to incapacitate or rehabilitate defendant, . . . defendant's ten-year sentence continues to serve the purposes of societal retribution and deterring others from engaging in similar conduct"). Those who might perpetrate a similar scheme need to know that if caught, they will receive a severe sentence.

The public also needs to know that a person who holds the public trust, like a lawyer, cannot escape justice. As the defendant has conceded, it is appropriate to hold attorneys to a high standard – to act at all times and in all dealings honestly, diligently, and independently. (See Defendant's Sentencing Memorandum, p. 21.)

---

[3] By the end of the scheme in 2009, Lewis had incorporated four companies for Canada: Trinity Trust Financial LLC in 2002, Providence Funding Inc., St. Luke Realty Capital in 2008, and Falcon Advisors Inc. in 2009. In a type of shell game, a new corporation was set up again and again by Lewis and Canada as victims and their representatives discovered the fraud of the corporation previously utilized in the scheme.

*The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.*

A sentence within the applicable guideline range is the best hope for avoiding such a disparity. *United States v. Wheaton*, 358 Fed.Appx. 742 (7th Cir. 2010). This is especially true in the case of "white collar" defendants, where the risk of disparate sentencing terms is perhaps most acute. The Seventh Circuit has recently stated: "a district court judge necessarily considers unwarranted disparities among defendants when it decides to impose a within-Guidelines sentence." *United States v. Pape*, 601 F.3d 743, 750 (7th Cir. 2010).

Lewis' co-conspirator Byron L. Canada was sentenced to 135 months imprisonment on December 9, 2010. The sentence requested by defendant Lewis here would create a gross disparity.

*The applicable guideline range*

With enhancements for 21 victims, misrepresentations during bankruptcy proceedings, sophisticated means, use of a special skill, and due credit for pleading guilty pursuant to an Information, the final adjusted offense level for defendant Lewis is 28 and the applicable guideline range is 78 - 97 months.

*Pertinent policy statements issued by the U.S. Sentencing Commission*

*- Family ties (5H1.6)*

It is anticipated that the defendant will argue against a guidelines sentence based on the effect his imprisonment will have on his family. But most families suffer emotional and financial harm when a parent is imprisoned. *United States v. Gary*, 613 F.3d 706, 710 (7th Cir. 2010). "Any experienced district judge has heard about those effects many times and must

14

recognize that those effects are consequences of the parent's crime, not the sentence imposed."
*Id.*

Guideline Section 5H1.6 provides that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."  U.S.S.G. § 5H1.6.  The policy statement by the Sentencing Commission further provides: "For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration."   U.S.S.G. § 5H1.6, n. 1(B).  Thus mitigation arguments relying on the effects of incarceration on children or other family must identify effects that go beyond those that any child "must suffer when a parent is imprisoned."  *United States v. Gary*, 613 F.3d 706, 710 (7th Cir. 2010).

The Seventh Circuit has held that arguments relying on the general hardships that most families suffer when a parent is imprisoned do not even require discussion at all by the district court.  *Gary*, 613 F.3d at 710.  See also *United States v. Jaderany*, 221 F.3d 989, 996 (7th Cir. 2000).  See also *United States v. Culbertson*, 406 Fed.Appx. 56 (7th Cir. 2010).  In sum, the negative effects on the Lewis family are the typical consequence of the defendant's own crimes here over a multi-year period.

*- Employment; civic and charitable service (5H1.5, 5H1.11)*

The defendant's "employment record is not ordinarily relevant in determining whether a departure is warranted."  U.S.S.G. § 5H1.5.  Similarly, "civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."   U.S.S.G. § 5H1.11.  As the Seventh Circuit has

15

explained, "[a] sentencing judge surely may elect to treat a defendant's contributions to his community as . . . grounds for a less severe sentence, but such contributions do little to establish that a sentence within the Guidelines range is unreasonable."  *United States v. Della Rose*, 435 F.3d 735, 738  (7th Cir. 2006); *United v. Baxter*, 217 Fed.Appx. 557 (7th Cir. 2007).  Here, a sentence at the low-end of the applicable guideline range, particularly considering the aggravating factors in this case, appropriately weights the defendant's past civic and charitable contributions.

- *Mental capacity and diagnoses (5K2.13)*

The defense has submitted a psychological evaluation of the defendant that was done by Warren Sibilla, Ph.D., clinical psychologist.  The report by Sibilla is difficult to understand at points not just because it discusses Greek mythology but because it uses ambiguous phrases such as "it would be reasonable to suspect," "it would be reasonable to expect," etc.  A further weakness of the Sibilla report is its attempt to evaluate Byron L. Canada without Sibilla ever having met or talked to Canada.

Psychologist Sibilla, however, does provide his "diagnostic impression" of Lewis using the multi-axis format of the DSM-IV.  On Axis I (for clinical syndromes), Sibilla finds depression and anxiety disorder.  This is not surprising given the defendant's history of depression in 2002 and his current legal situation.  In any event, Lewis is being treated for these mental health issues.

On Axis II (for developmental disorders and personality disorders), Sibilla finds narcissism.  Personality disorders are clinical syndromes which have more long lasting symptoms and encompass the individual's way of interacting with the world.  According to the DSM-IV,

16

someone who suffers from narcissism has at least five of the following characteristics:

1.  has a grandiose sense of self-importance (e.g., exaggerates achievements and talents, expects to be recognized as superior without commensurate achievements)
2.  is preoccupied with fantasies of unlimited success, power, brilliance, beauty, or ideal love
3.  believes that he or she is "special" and unique and can only be understood by, or should associate with, other special or high-status people (or institutions)
4.  requires excessive admiration
5.  has a sense of entitlement, i.e., unreasonable expectations of especially favorable treatment or automatic compliance with his or her expectations
6.  is interpersonally exploitative, i.e., takes advantage of others to achieve his or her own ends
7.  lacks empathy: is unwilling to recognize or identify with the feelings and needs of others
8.  is often envious of others or believes that others are envious of him or her
9.  shows arrogant, haughty behaviors or attitudes.

Despite the presence of narcissism and depression in the defendant, there is nothing in the Sibilla report to suggest that the defendant has a significantly reduced mental capacity.  Under the Guidelines, a "significantly reduced mental capacity" means a significantly impaired ability to either "(A) understand the wrongfulness of the behavior comprising the conviction or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, n. 1; see also *United States v. Roach*, 296 F.3d 565, 568 (7th Cir. 2002); *United States v. Rice*, 520 F.3d 811, 821 (7th Cir. 2008).

While the defendant's use in his sentencing memorandum of the Sibilla examination and report should be unavailing in its effort to obtain a more lenient sentence, some parts are of note as to why a guidelines sentence should be imposed here.  According to the defense, Lewis' personality traits made him "susceptible to doing and saying just about anything" including lying to support Canada and the seven-year scheme.  (See Defendant's Sentencing Memorandum, p. 11.)  The defense further asserts that Lewis "marched in lock step" with Canada.  (Id.)  And that

17

"everything else just became background noise for him."  (Id.)

**Defendant's Objections to the Presentence Report**

The governments responds to the defendant's objections to the Presentence Report which were timely submitted October 13, 2011.

*Sophisticated Means*

The defendant objects to the inclusion of a two level increase in offense level pursuant to U.S.S.G. §2B1.1(b)(9)(C).  This objection is not well taken.  The enhancement is correctly included in the Report.

The defendant concedes "there can be no dispute that Canada's scheme was sophisticated" but argues that the enhancement should not be applied because it was not his scheme.  The defendant overlooks the fact that he participated in the scheme for more than seven years; the defendant worked with Canada as his principal transactional and "general counsel" from 2002 through December 2009.   Lewis prepared all of the supposed loan closing documents that were sent to victims but never fully executed.  Lewis often wrote to victims telling them things that had to be done or documents that had to be provided in advance of or for the closing. Victims supplied these and then Lewis temporized and came up with more "hoops" for the victims to jump through – some of which made no sense.  Then, as the promised loan closing date approached or a period of time otherwise elapsed, Canada and Lewis made themselves unavailable.  Each stopped returning phone calls and other queries from victims, their representatives, and their lawyers.  Or Canada would refer victims and their representatives to Lewis, who would also eventually stop responding to their queries.  When victims would persist in their communications with Canada and Lewis, Lewis would sometimes threaten to sue or

18

counter-sue any victims who continued to seek the loan or seek further communications with Canada, his companies, or Lewis.

Lewis' role was critical in stringing victims along and making them believe that Canada could and would supply the promised loans for which the advance fees had been paid. Indeed, at times, Lewis was the principal contact with the victims. The defendant's objection also overlooks that Lewis played a principal role in making direct misrepresentations to the victims and their representatives. As recounted in the Report and conceded in sentencing papers by the defendant, Lewis lied to victims telling them among other things that he and Canada had previously closed on loans. Lewis also told victims, for example, that Providence Funding had recently closed loans on projects that were similar to their projects. Lewis assured victims that Providence Funding would be able to provide direct funding for the promised loans. Lewis assured victims and their representatives that Providence Funding was a legitimate company despite their concerns that it was all a fraud with Lewis going so far as to say that he would stake his personal reputation as a lawyer on Canada and his company.

In any event, the application of the sophisticated means enhancement is not an enhancement that applies only based on the defendant's personal conduct but rather applies based on the overall sophistication of the total scheme. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) ("There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement. Rather, it is sufficient if the totality of the scheme was sophisticated"); *United States v. Wayland*, 549 F.3d 526, 529 (7th Cir. 2008). As the Court in *United States v. Jagunna*, 426 Fed.Appx. 94 (3rd Cir. 2011), explained:

Importantly, the language of § 2B1.1(b)(9)(C) is directed to the offense, and not the

19

defendant's individual conduct.  *Cf.* U.S.S.G. app. C, amend. 577, p. 5 (explaining that
the similar enhancement, in U.S.S.G. § 2T1.1, "is based on the overall offense conduct
for which the defendant is accountable," and not "the personal conduct of the
defendant").

As such, the defendant's concession – that the scheme here was sophisticated –  mandates

by itself application of the two level enhancement.

*Minimal/Minor Role*

Section 3B1.2 provides:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by **4**
levels.
(b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.

As noted above, defendant Lewis played a substantial role in the advance fee fraud

scheme here.  The defendant worked with Canada as his principal transactional and "general

counsel" from 2002 through December 2009.  Lewis prepared all of the supposed loan closing

documents.  Lewis would often write to victims telling them things that had to be done or

documents that had to be provided in advance of the closing.  Victims would supply these and

then Lewis would come up with more "hoops" for the victims to jump through.

Lewis' role was critical in stringing victims along and making them believe that Canada

could and would supply the promised loans for which the advance fees had been paid.  As noted,

Lewis was the principal contact with the victims at times and a critical component of the stall

tactic of the scheme.  The defendant's objection also overlooks that Lewis played a principal role

in making direct misrepresentations to the victims and their representatives. Lewis lied to

victims telling them among other things that he and Canada had previously closed on loans. But

for the participation of Lewis in the scheme, the scheme could not have continued and could not

have ensnared the number of victims that it did. Lewis also personally participated in making

direct misrepresentations to the Bankruptcy Court in California.

In any event, application note 3(B) provides:

> If a defendant has received a lower offense level by virtue of being convicted of an
> offense significantly less serious than warranted by his actual criminal conduct, a
> reduction for a mitigating role under this section ordinarily is not warranted because such
> defendant is not substantially less culpable than a defendant whose only conduct involved
> the less serious offense.

U.S.S.G. § 3B1.2, n. 3(B).

The Seventh Circuit has made clear that "[i]n determining the applicability of § 3B1.2,

'the relevant inquiry is whether the defendant was a minor participant in the crime for which he

was convicted, not whether he was a minor participant in some broader conspiracy that may have

surrounded it.' " *United States v. Griffin*, 150 F.3d 778, 787 (7th Cir.1998) (quoting *United

States v. Brown*, 136 F.3d 1176, 1185-86 (7th Cir.1998)). See also *United States v. Isienyi*, 207

F.3d 390, 392 (7th Cir. 2000); *United States v. Burnett*, 66 F.3d 137 (7th Cir.1995); *United

States v. Cobblah*, 118 F.3d 549, 552 (7th Cir.1997); *United States v. Uriostegui-Estrada*, 86

F.3d 87, 90 (7th Cir.1996); *United States v. Lampkins*, 47 F.3d 175, 180-81 (7th Cir.1995).

Here Lewis guideline range has already been reduced with respect to the amount of loss

and number of victims. Lewis is only being held accountable for a $1,524,212.50 loss when the

entire scheme resulted in a total loss of $3,558,917.50. Similarly, Lewis is only being held

accountable for 21 of the 100 victims of the scheme. There can be no doubt that Lewis was not a

21

minimal or minor participant with respect to that portion of the total scheme for which he is being held to account. As such, no reduction under Section 3B1.2 is applicable.

*Lewis lied to the FBI*

The government agrees that an obstruction of justice enhancement is not warranted because the defendant was not separately charged with a Section 1001 violation and because the defendant's false statement did not significantly obstruct or impede the investigation of the instant offense. U.S.S.G. § 3C1.1, n. 4(G) and 5(B). While the defendant's false statement was material and was significant, the defendant's false statement did not *significantly* obstruct or impede the investigation of the instant offense. This notwithstanding Lewis' after-the-fact rationalization in April 2010 (when he gave a sworn statement to the government) for his March 2007 false statement.

Lewis told the FBI when interviewed in March 2007 that Providence Funding Inc. was incorporated and set up in 2005 because Trinity Trust never got going. This assertion was false and Lewis knew it was false at the time that he made it. Lewis knew from his own deleterious participation in deals involving Trinity Trust and his own substantial billings for Trinity Trust work that he did that Trinity Trust *did* get going and that Trinity Trust had been engaged in substantial business activity from 2003 through the first part of 2005. It was therefore within Lewis' personal knowledge that his statement to FBI agents regarding Trinity Trust was false and obviously so.

22

**Defendant's Late-filed objections to the Presentence Report/Downward departure motions**

The governments also responds in this Sentencing Memorandum to the defendant's late-filed objections to the Presentence Report and motion for downward departures, which were submitted October 31, 2011.  The government first received notice of these late objections/motion on Sunday October 30, 2011.

Rule 32(f)(1) provides that "within 14 days after receiving the presentence report, the parties must state in writing any objections . . ."  Fed.R.Crim.P. 32(f)(1).  A copy of those objections must be served on the opposing party as well as the probation officer.  Fed.R.Crim.P. 32(f)(2).  The following objections are untimely and are without an adequate explanation for why they have been filed so late.  The government responds to these eleventh-hour and in any event non-meritorious objections below.

*Section 2B1.1(b)(8)(B)*

The defendant objects to the two-level enhancement under Section 2B1.1(b)(8)(B).  The defendant does not dispute that the enhancement is well grounded factually; there is no dispute that Canada and Lewis made misrepresentations in the bankruptcy court proceedings in the Southern District of California in the 2008 declarations.  (See Defendant's Sentencing Memorandum, p. 6: "Lewis assisted Canada in drawing up a declaration that both denied and misrepresented Canada's prior criminal history with regard to an advance fee scheme for which Canada served time in the early 1990s.")  Rather, the defendant objects to the application of the enhancement because he argues that Byron L. Canada was not assessed this two-level enhancement when he was sentenced.  The defendant's argument is misplaced.

23

The U.S. Sentencing Guidelines provide that each section of the Guidelines is to be applied in order.  U.S.S.G. § 1B1.1.  Canada's sentencing guideline level was enhanced two levels under Section 2B1.1(b)(8)(A) for a misrepresentation that the defendant was acting on behalf of a charitable or religious organization.  (See Court's Sentencing Memorandum, Case no. 3:09-CR-156 RM, docket no. 45, p. 2.)  Under Section 2B1.1(b)(8), there is only one two-level increase even if more than one subsection in 2B1.1(b)(8)(B) is applicable.  U.S.S.G. § 2B1.1, n. 7(A) ("The adjustments in subsection (b)(8) are alternative rather than cumulative").  In other words, Canada's sentence was not enhanced under Section 2B1.1(b)(8)(B) – misrepresentations during a bankruptcy proceeding – because it had already been enhanced under Section 2B1.1(b)(8)(A).

In any event, and in the alternative, defendant Lewis' adjusted guideline level could be enhanced under Section 2B1.1(b)(8)(A) as well because the misrepresentation that Canada was acting on behalf of a charitable or religious organization was part of the scheme and Lewis participated in, supported, and helped to execute the scheme.  Indeed, Lewis helped Canada's endeavors to pass himself off as an authentic religious by vouching for Canada's religious credentials and even supporting in writing Canada's efforts to obtain a loftier ecclesiastical title. (See Defendant's Sentencing Memorandum, pp. 3-4.)

*Motion for departures*

"The concept of departures was rendered obsolete when the guidelines were made advisory" in *Booker. Bonds v. United States*, Slip Copy, 2011 WL 4842650 (Oct. 13, 2011). "District courts can still take guidance from the departure provisions in the guidelines and apply them by way of analogy when assessing the § 3553(a) factors."  *Id.*; see also see *United States v.*

24

*Guyton*, 636 F.3d 316, 320 n. 2 (7th Cir. 2011).

While the defendant's "motion" for downward departures is late, the essential grounds of this motion were anticipated by the government and have been addressed previously in the discussion of pertinent policy sections of the government's Section 3553(a) analysis.  The government firmly believes that no departures are warranted here, including under Sections 5H1.5, 5H1.6, and 5H1.11.

*Lewis' cooperation*

Most plainly, defendant's Lewis has not provided substantial assistance in the investigation or prosecution of another person.  U.S.S.G. § 5K1.1.  Lewis has not been interviewed by agents in any proffer session.  Lewis has not testified in the grand jury or any court proceedings.  Lewis has not made any recorded calls and been supervised in any activity by any law enforcement agent.

Lewis has *desired* to cooperate with the government in the investigation and prosecution of other persons.  Lewis has provided through his counsel a very small amount of information regarding one of Canada's employees who is believed to have assisted in the scheme.  But this information was of no real help to the government in the investigation and prosecution of any other person.  No departure is warranted for cooperation by Lewis.

25

**United States' Sentencing Recommendation**

Lewis had actual knowledge of the advance fee fraud scheme, shared Canada's intent to defraud, and directly participated in, executed, and furthered the scheme.  Considering and balancing the various 3553(a) factors and pursuant to the terms of the written plea agreement, the government recommends that the Court impose as condign punishment for defendant Canada a term of imprisonment at the low-end of the applicable guideline range, 78 months imprisonment, to be followed by a period of supervised release.

An order of restitution in favor of the listed victims is also requested.

Dated: October 31, 2011

Respectfully submitted,

DAVID A. CAPP
UNITED STATES ATTORNEY


By:     s/Donald J. Schmid
        Donald J. Schmid
        Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 31, 2011, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which sent notification of such filing to defense counsel.

<div style="margin-left: 45%;">

s/ Christine Carson
United States Attorney's Office
204 S. Main Street, Room M01
South Bend, IN 46601
(574) 236-8287

</div>